IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE MULLIGAN MINT, | § | |
| | § | |
| Debtor, | § | |
| | § | |
| | § | |
| MULLIGAN MINT, INC., | § | |
| | § | |
| Appellant, | § | 3:13-CV-5045-P |
| | § | (Bank. Ct. No. 13-34728-SGJ11) |
| | § | |
| MILE H. SEGNER, JR., | § | |
| | § | |
| Intervenor, | § | |
| | § | |
| v. | § | |
| | § | |
| REPUBLIC METALS CORP. | § | |
| | § | |
| Appellee. | § | |
| | § | |

APPEAL FROM THE
UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS

**OPINION**

This is an appeal from the Bankruptcy Court's denial of a motion to enforce the automatic stay. The Court AFFIRMS the Bankruptcy Court's denial of relief.

**I.    Background**

As the Bankruptcy Judge said, "This is all a mess, to be quite honest."

Appellant and Debtor Mulligan Mint, Inc. ("the Corporation") is run by two brothers, Rob and David Gray. Even before the Corporation was formed, the Grays ran a minting operation that made commemorative coins from precious metals. At this nascent stage, the

Grays started using RMC as a silver supplier, first on a cash-for-silver basis and later in a consignment-like arrangement. However, the silver that RMC shipped to the Grays eventually started to disappear without payments being made. (The record gives several potential explanations for the missing silver, including "idiocy," "theft," "material loss," or "growing pains.")

Shortly after the silver began disappearing but before RMC knew about it, the Grays filed a Certification of Formation to create the Corporation. The parties vigorously dispute whether the Grays transferred their business assets to the Corporation when it was created. (Why that matters will be clear later.) The Corporation did have bank accounts in its name and purchased some precious metals from suppliers other than RMC. But even at that same time, the Grays continued to purchase metals in their own name and using their own accounts.

Two days after the Corporation was formed, Rob Gray met with RMC and informed them of the missing silver. RMC took immediate action, suing the Grays and any businesses associated with them, including the Corporation, in Texas state court. The state court issued a writ of sequestration and a writ of prejudgment attachment that applied to the real property, minting equipment, and precious metals that the Grays (or the Corporation, depending on who you ask) used. On August 8, the Dallas County Sheriff's Department executed the writs and seized the minting equipment and precious metals.

Facing the prospect of an expanded writ of attachment, the Grays contacted RMC to work out a deal. The details and intent of this deal are also hotly contested. What is clear is that they drafted and filed an agreed order ("Agreed Order") that released some of the seized gold and silver to RMC. The state court accepted it on September 6.

One week later, the Grays signed a document transferring all of the minting equipment and other assets to the Corporation. (It is referred to as the Assumption Agreement.) It purported to be effective back to July 1, the date that Mulligan Mint, Inc. was incorporated. Immediately after, the Corporation filed for Chapter 11 bankruptcy. Elsewhere, RMC picked up some of the seized gold and silver from the Dallas County Sheriff's Department just as the Agreed Order directed. (For ease of reference, the Court refers to the portion of the seized gold and silver that RMC obtained possession of as the Disputed Metals.)

With the Disputed Metals in RMC's hands, the Corporation filed an Emergency Motion to Enforce the Automatic Stay. The Bankruptcy Court held a series of hearings to resolve the motion. The parties argued primarily over whether the Corporation had a property interest in the Disputed Metals.

Ultimately the Bankruptcy Court denied the motion. It first pointed out that "[t]he debtor has not filed an adversary proceeding, as required, for obtaining turnover relief." R. at 1370. Nonetheless, it went "forward with a hearing on the merits to determine whether some sort of relief to the debtor is warranted here." R. at 1370. In the end, the Bankruptcy Court concluded that none of the Disputed Metals—or any of the Grays' previous business entity's assets—were transferred to the Corporation when it was created. R. at 1372. The Assumption Agreement could not convey the Grays' interest in the Disputed Metals to the Corporation because the Grays had already transferred their rights through the Agreed Order in state court. (The Bankruptcy Court left open the possibility that whatever ownership interest the Grays retained after the Agreed Order were transferred to the Corporation through the Assumption Agreement. *See* R. at 1372 ("I am assuming for purposes of this analysis, that David Gray and Robert Gray at least transferred what they still owned on September 13th, 2013 related to [the previous business

entity.]"")) The Bankruptcy Court continued, "A new entity cannot invoke the protections of the automatic stay, or something akin to Chapter 5 avoidance actions when it had no property itself to convey on September 6th, 2013." R. at 1373.   It was the Grays—not the Corporation—who would have to declare bankruptcy to argue that the transfer of the Disputed Metals was an avoidable transfer. R. at 1373 ("[T]he newly formed debtor corporation cannot be vested with avoidance actions of the individuals."). Since none of the Disputed Metals ever belonged to the Corporation, the automatic stay did not apply to any of the Seized Assets, no matter what form of relief the Corporation requested.

The Corporation appealed. It disagrees with the Bankruptcy Court that the automatic stay does not apply to the Disputed Metals. But more disconcerting to it is the Bankruptcy Court's route to that conclusion. The Corporation believes that making findings about what the Corporation owned before the Agreed Order—and discussing the implications for avoidance actions—violated its due process rights. It appeals both the denial of the automatic stay and the broader conclusions.

## II.    Legal Standards

This Court reviews the Bankruptcy Court's findings of fact for clear error and conclusions of law de novo. *See In re U.S. Abatement Corp.*, 79 F.3d 393, 397 (5th Cir. 1996). "A finding is clearly erroneous and reversible only if, based on the entire evidence, the reviewing court is left with the definite and firm conviction that a mistake has been made." *In re Young*, 995 F.2d 547, 548 (5th Cir. 1993) (internal quotation marks omitted). "This Court defers to the trier of fact in resolving conflicts requiring credibility determinations." Galvan v. Cockrell, 293 F.3d 760, 764 (5th Cir. 2002). That extends to the "implicit rejection" of evidence. *Id.*

## III.    Due Process Violation

The Corporation vigorously argues that the Bankruptcy Court went too far in its ruling. In its view, the hearing and order should have focused exclusively on "whether the Debtor had an interest in the [Disputed Metals]." Doc. 5 at 53. Any adjudication over the actual ownership of the Disputed Metals or the existence of an avoidance action, the Corporation argues, was beyond the permissible scope of the hearing. Consequently, it argues, the Bankruptcy Court violated its due process rights.

A large part of the due process issue in this case revolves around the necessity for adversary proceedings in particular circumstances. The point of the Corporation's stay motion was to receive "an order commanding RMC to immediately return the Seized Property to the Debtor." R. at 91.[1] Under Fed. R. Bankr. P. 7001(1), that type of request can only be granted through an adversary proceeding. Instead of pursuing the relief through an adversary proceeding, the Corporation filed a motion as a contested matter. RMC made clear that it objected to adjudicating the issue as a contested matter rather than through an adversary proceeding and explicitly said it did not consent to proceeding as a contested matter. R. at 109.

At a hearing, the Bankruptcy Court addressed the Corporation's counsel about the procedural problem:

> THE COURT: … We could get started on this motion and I could hear your evidence as to whether there is a stay violation going on or not. And I could, perhaps, enter some sort of relief as is determined to be just and appropriate. I'm not sure I can go the full and final step of ordering turnover without an adversary. You may need to separately go out and file another piece of paper and file an adversary proceeding…. Knowing that is my thinking, do you want to go forward today to perhaps get in evidence about whether there's a stay violation going on here or not, and whether there might be other just and appropriate relief, to use your prayer language?

---

[1] It also added "and any such other relief as may be just and appropriate." No other form of relief was ever suggested by the Corporation, RMC, or the Bankruptcy Court.

[THE CORPORATION'S COUNSEL]: Your Honor, the evidence would be much of what we've discussed.... I must do something to start getting control of this case for the benefit of everyone.... I don't want to waste the Court's time, but I feel compelled to go forward today and hope that at least Your Honor will give us a ruling on whether the stay is implicated.

R. at 762-63. The court continued forward, ruling against the Corporation in a way that it believes it never could have anticipated.

Before addressing the Corporation's argument, it is important to understand what the Corporation is not arguing. The Corporation is not arguing that the Bankruptcy Court should have tried the stay motion as an adversary proceeding. The Bankruptcy Court made clear at the outset that it could not order turnover relief without an adversary proceeding. So it explicitly limited the nature of the hearing to a determination of whether the automatic stay was violated and, if so, any appropriate relief.

The Corporation believes that the Bankruptcy Court went too far by adjudicating issues, without notice or an adversary proceeding, that the Corporation did not expect it to adjudicate. The two issues supposedly outside of the scope of its motion were (1) whether the corporation owned the Disputed Metals before September 13, 2013 and (2) whether the transfer of the Disputed Metals by the Agreed Order of September 6, 2013 by the Corporation was subject to avoidance actions.

The problem with the Corporation's argument is that the first issue was a necessary issue to resolve and the second is the natural implication of the court's findings. Further, the Corporation argued in the Bankruptcy Court that it could avoid the transfer of the Disputed Metals to RMC and the issue was briefed and argued by the parties in the Bankruptcy Court.

The first issue was necessary because the court had to determine whether the Corporation owned the Disputed Metals. In general, the automatic stay applies to "property of the estate." 11

U.S.C. § 362.   In any stay proceeding, the Bankruptcy Court is forced to answer the threshold question of whether the affected property belongs to the estate.   So determining whether the Corporation owned the Disputed Metals was necessary to resolving whether a violation of the stay occurred.

Of course, a stay motion is not an opportunity to roam freely and determine irrelevant ownership interests.   The Corporation seems to think that the Bankruptcy Court did just that, eliminating the possibility that it owned any property whatsoever.   For example, the Corporation argues that it had bank accounts registered in its name that were unrelated to the Disputed Metals and were implicated by the stay motion.   Determining whether the Corporation owned that property would be outside of the scope of its motion.   But the Bankruptcy Court's decision when read in context never suggests that it reached those ownership claims.   It explicitly acknowledged that other ownership interests outside of the Disputed Metals could exist when it "assum[ed] for purposes of [its] analysis" that the Grays transferred other ownership interests to the Corporation.   And it never discredits the possibility that the Corporation owned property outside of the Disputed Metals and other seized assets.   So the Bankruptcy Court properly confined itself to an analysis of the property that mattered for the stay motion.

The Corporation identifies another concern about how the Bankruptcy Court addressed the property issue: the Bankruptcy Court could have ruled solely on a narrower property issue—whether the Corporation had an interest in the Disputed Metals—and never needed to reach the broader ownership question.   This argument is similarly unavailing.   Just because a Court has to deal with only the issue before it does not mean it must identify the narrowest issue possible and then address it with scalpel-like precision.   Factfinders are vested with wide discretion to resolve a factual dispute on whatever evidence is before it.   In this case, the issue was whether the

Corporation owned the Disputed Metals; the Bankruptcy Court's conclusion that the Corporation never owned the Disputed Metals resolved it.[2]

The second issue that the Corporation identifies as outside of the scope of the motion was the availability of an avoidance action by the Corporation. But this "issue" is really just the natural implication of the Bankruptcy Court's finding that the Corporation never owned the property. Without ever having a property interest in the Disputed Metals, the Corporation could not avoid their transfer. Thus, the Bankruptcy Court's factual finding that the Corporation never owned the Disputed Metals was proper. Its comments about avoidance actions were permissible commentary on the Corporation's arguments.

## IV.   Denial Of The Motion To Enforce The Automatic Stay

That leaves the only real issue in the case: whether the Bankruptcy Court was wrong to conclude that the Disputed Metals were not part of the estate because the Corporation never owned them. That finding depends on resolution of a series of factual disputes that the Bankruptcy Court was entitled to resolve against the Corporation.

### a.   The Origin Of The Disputed Metals

The Disputed Metals consisted of gold and silver that were seized by the Dallas County Sheriff's Department pursuant to the writ of attachment. No one disputes that the Grays had physical possession of all the Seized Assets prior to seizure. The question is whether the Grays held it for their previous business entity (that operated as sole proprietorship or joint venture) or on behalf of the Corporation. The Disputed Metals' origins are mostly a mystery. Records show that the Grays purchased some of the metal prior to the creation of the corporation; others show

---

[2] The Corporation also complains that it could not have known that the broader ownership issue would be resolved. But that is belied by the briefing below, much of which addressed that very issue. *See* R. at 100, 651-55. RMC's arguments put the Corporation on notice that those theories of ownership would be contested at the hearing.

that the Corporation purchased some silver and gold after its creation on July 1; and still other records show that some metal was purchased by the Grays after the corporation was formed. However, no records exist that can trace where the metal in the Seized Assets came from. So the pile of gold and silver that is the Disputed Metals has an unknown composition of pre-incorporation Gray-purchased metal, post-incorporation Corporation-purchased metal, and post-incorporation Gray-purchased metal.

      b.  The Gray's Previous Business Entity Did Not Transfer Ownership Of Its Property To The Corporation When The Corporation Was Formed

The Corporation's first argument is that when the Grays created the Corporation, they transferred all of their previous business entity's assets to the Corporation. If so, then the Corporation would have had ownership over all of the Seized Assets. But this depends on a question of fact that the Bankruptcy Court resolved against the Corporation.

One of the issues before the Bankruptcy Court was whether the Grays business prior to incorporation acted as a sole proprietorship or partnership. The Corporation insists it was a sole proprietorship. The insistence is understandable; if it was considered a partnership, then under Tex. Bus. Org. Code § 10.154, it would have needed to file a Certificate of Conversion to have the Corporation replace it. Evidence was put on that suggested that the previous business entity could have been either form, a sole proprietorship or a partnership/joint venture. And the Corporation produced no Certificate of Conversion showing it was meant to replace the former business entity.

But, the Corporation argues, "objective evidence" showed that the former business entity transferred ownership over its assets to the Corporation. The objective evidence it identifies, however, could just as easily be construed to keep ownership in the former business ventures'

hands. For instance, it argues, "Not only did the Debtor have possession of the [the previous business entity]'s property, thus raising the presumption of ownership, but the fact that the [Corporation] had such possession is proof that the [previous business entity] intended to transfer its assets to the [Corporation] and that it actually transferred those assets." However, the evidence is that the Grays, who ran the previous business entity and the Corporation, held "possession". Which business entity actually "possessed" the property for legal purposes was ambiguous. The Bankruptcy Court's factual finding that it was the previous business entity, rather than the Corporation, that "possessed" the property was reasonable.

     c. <u>The Grays Surrendered Any Interest They Had In The Seized Assets Through The Agreed Order In State Court; Consequently, The Assumption Agreement Was Ineffective</u>

Finally, the Corporation argues it had ownership by virtue of the Assumption Agreement the Grays signed immediately before bankruptcy. The Bankruptcy Court rejected that argument. It found that the Grays surrendered any rights they had to the Disputed Metals through the Agreed Order signed a week earlier. Because the Grays no longer had ownership over the Disputed Metals, they could not transfer them to the Corporation through the Assumption Agreement.

The problem with the Bankruptcy Court's analysis, the Corporation argues, is that it depended on errant legal conclusions and did not weigh the evidence properly. Both arguments miss the mark.

The Agreed Order was a state court order that directed the Sheriff's Department to "release to the designated representative of [RMC] the precious metals described in the Property Receipt attached hereto as Exhibit A." (Note that those metals are the Disputed Metals.) The

Bankruptcy Court construed the Agreed Order to be part of a broader transaction that conveyed title from the Grays to RMC.

The thrust of the Corporation's argument is that the Agreed Order has the effect of a stand-alone contract and should be subject to the same legal requirements. Any discussion about the effect of the Agreed Order, thus, would have to be limited to the text, and extrinsic evidence would be admissible only if it is ambiguous. But the state court order was not a contract. It was a step in a broader plan that was a contract. But the order itself was not meant to embody a contract.[3] Thus, it is wrong to focus on ambiguity or extrinsic evidence when the Agreed Order was not meant to embody the entirety of the agreement between the parties.

Instead, the Corporation must show that the Bankruptcy Court's findings about the negotiation and agreement that led to the Agreed Order were incorrect. As the Corporation admits, there is conflicting evidence on that subject. *See* Doc. 13 at 14.[4] It identifies a number of factors why it believes its evidence was more persuasive than RMC's evidence.[5] But weighing evidence is a responsibility for the factfinder, to be overturned on appeal in only the rare situation when the reviewing court "is left with a definite and firm conviction" that the

---

[3] That is what distinguishes the only authority that the Corporation cites for the proposition that interpretation of the Agreed Order and its effect is limited by the parol evidence rule. See Coker v. Coker, 650 S.W.2d 391 (Tex. 1983) (analyzing an order that included in it an agreement that the parties wrote and agreed to be bound by).

[4] The Corporation argues that all of the evidence admitted about the negotiation was hearsay. But it does not highlight any portions of the record that show it objected to the evidence or what specific evidence was admitted that was hearsay. It is the advocates' responsibility to bring portions of the record to the Court's attention. *See Gross v. Town of Cicero*, 619 F.3d 697, 702 (7th Cir. 2010) ("Judges are not like pigs, hunting for truffles buried in the record.") (internal brackets omitted) (citing United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991)). Without a specific, concrete portion of the record that the Court can look to, it is unable to determine whether evidence was wrongly admitted.

[5] The Court is skeptical of most of the Corporation's arguments about why it had the better evidence. For instance, it argues that RMC's witnesses appeared by telephone and that some of them were attorneys. The Court is unsure why that makes RMC's evidence less credible. Regardless, the Bankruptcy Court was entitled to resolve conflicting evidence and weigh credibility. It is not this Court's prerogative to second guess absent something more than what the Corporation has asserted.

finding was wrong.  The Corporation has not shown anything here that casts doubt on the Bankruptcy Court's findings.  This Court will not second-guess that determination.

In summary, the Corporation identifies a number of decisions the Bankruptcy Court made that it believes are legal error.  None of them are.  The rest of its appeal comes ultimately comes down to factual determinations that the Bankruptcy Court was entitled to make and were reasonable.  The Court finds no reason to disturb the Bankruptcy Court's order and therefore AFFIRMS.

Signed this _22th_ day of August, 2014.


JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE